UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE-OPELOUSAS DIVISION

| | |
|---|---|
| **BRIAN N. LONDO** | **CIVIL ACTION NO. 06-2087** |
| **VS.** | **JUDGE MELANÇON** |
| **LINDA S. MCMAHON**<br>**ACTING COMMISSIONER**<br>**OF SOCIAL SECURITY** | **MAGISTRATE JUDGE METHVIN** |

*REPORT AND RECOMMENDATION*

Before the court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, **IT IS RECOMMENDED** that the Commissioner's decision be **REVERSED.**

*Background*

This is a medical improvement case involving a mentally retarded claimant. Brian Londo was born on June 11, 1979 and is currently 28 years old. He has a high school special education "certificate" and has attempted to work at various jobs in the past, all lasting less than three months.

Londo began receiving disability in September 1990, at age 11, based upon a finding that his mild mental retardation met the requirements of § 12.05D of Appendix 1.[1] A benefits review in 1998 concluded that Londo was still disabled. Another review in 2002 concluded that Londo was no longer disabled because of medical improvement in his condition. Londo appealed. After an administrative hearing, the ALJ issued a decision on May 23, 2006, finding that Londo

---

[1] Tr. 195-207.

2

was no longer disabled.[2] The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner from which Londo now appeals.[3]

### *Issue presented*

The sole issue is whether the ALJ's decision comported with the applicable regulations, and is supported by substantial evidence in the record.

### *Medical Improvement Standard*

The Secretary may terminate disability benefits only if substantial evidence demonstrates that: (A) there has been any medical improvement in the individual's impairment or combination of impairments (other than medical improvement which is not related to the individual's ability to work), and (B) the individual is now able to engage in substantial gainful activity. 42 U.S.C. §423(f)(1); Griego v. Sullivan, 940 F.2d 942, 944 (5th Cir.1991).

The burden of proof lies with the Secretary in termination proceedings. Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002); Griego v. Sullivan, 940 F.2d 942, 944 (5th Cir.1991).

The implementing regulations define a medical improvement as "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled." 20 C.F.R.

---

[2] Tr. 370-399; 14-21.

[3] The court's review is restricted under 42 U.S.C. §405(g) to two inquiries: (1) whether the Commissioner's decision is supported by substantial evidence in the record; and (2) whether the decision comports with relevant legal standards. Carey v. Apfel, 230 F.3d 131, 136 (5th Cir. 2000); Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir.1992); Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Carey, 230 F.3d at 136; Anthony, 954 F.2d at 292; Carrier v. Sullivan, 944 F.2d 243, 245 (5th Cir. 1991). The court may not reweigh the evidence in the record, nor substitute its judgment for that of the Commissioner, even if the preponderance of the evidence does not support the Commissioner's conclusion. Carey, 230 F.3d at 136; Johnson v. Bowen, 864 F.2d 340, 343 (5th Cir.1988). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the decision. Johnson, 864 F.2d at 343.

3

§404.1594(b)(1). A determination of medical improvement "must be based on changes (improvement) in the symptoms, signs, and/or laboratory findings associated with your impairment(s)." A medical improvement is only related to an individual's ability to work "if there has been a decrease in the severity ... of the impairment(s) present at the time of the most recent favorable medical decision and an increase in your functional capacity to do basic work activities." 20 C.F.R. § 404.1594(b)(3).[4]

### *Findings and Conclusion*

Londo's mental retardation was found disabling under §12.05D of Appendix 1 both at the time of his initial disability determination in1990, and again in 1998, upon review. The requirements of that Listing are as follows:

> *§12.05  Mental retardation:* Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> \*\*\*     D.  A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
>
>    1. Marked restriction of activities of daily living; or
>
>    2. Marked difficulties in maintaining social function; or
>
>    3. Marked difficulties in maintaining concentration, persistence, or pace; or
>
>    4. Repeated episodes of decompensation, each of extended duration.

---

[4] The second part of the evaluation process relates to ability to engage in substantial gainful activity. Here the implementing regulations incorporate many of the standards set forth in the regulations governing initial disability determinations. See 20 C.F.R. § 404.1594(b)(5) and (f)(7). The difference is that the ultimate burden of proof lies with the Secretary in termination proceedings. Griego v. Sullivan, 940 F.2d at 944.

4

The ALJ who reviewed Londo's case in 1998 noted that Londo was restricted in the activities of daily living, and had been unable to perform satisfactorily in a work setting:

> Henry J. Lagarde, Ph.D., who is a clinical psychologist, performed a consultative evaluation of the claimant on August 21, 1997, when the claimant was eighteen years and two months old. He obtained a full-scale IQ score of 64 with a verbal score of 63 and a performance score of 66. These scores reflect intellectual capability in a mild mental retardation range. He would need assistance with the management of his funds. Dr. Lagarde interviewed the mother of the claimant who stated that Brian did not cook. He does no chores around the house. He does not go into town alone and does not shop alone. He does not handle money with any understanding. He does not have a driver's license. He cannot read, according to his mother.
>
> Exhibit 32 is a statement from Preston Dugas, who employed the claimant. Dugas stated that he hired the claimant at a milling company and the claimant was very slow catching on to the work. The claimant is very forgetful when he is told to perform certain activities. He is afraid of the machinery and equipment and is a slow worker. Claimant received this job through his uncle. He was unable to keep up with simple tasks such as sweeping and cleaning up.[5]

When Londo's case next came up for review in 2002, the ALJ found medical improvement because Londo's functioning "has increased to the point that he is able to live independently." The ALJ concluded that Londo's condition no longer met or equaled an Appendix 1 Listing. The ALJ wrote:

> The medical evidence supports a finding that, as of April 1, 2002, there had been a decrease in medical severity of the impairment. At the time of the CPD,[6] the claimant lived with his mother and had never lived alone. He was unable to handle money or take care of any household chores or shopping. In June 2001, the claimant's mother reported to Dr. Sagrera that the claimant was living alone and was able to manage his own money and pay his own bills. The claimant reported to Dr. Durdin in September, 2002 that he had been living independently for about seven months, though with some assistance with reading mail and

---

[5] Tr. 194, 200.

[6] "CPD" stands for "comparison point decision," and refers to the most recent favorable medical decision finding that the claimant continued to be disabled – here, the decision of October 27, 1998.

5

paying bills. The Administrative Law Judge finds the claimant has experienced medical improvement, as his functioning has increased to the point that he is able to live independently.[7]

The ALJ's conclusion is not supported by substantial evidence. As noted, the ALJ gave much weight to the finding that Londo lived "independently." However, at the time of the hearing Londo was living with his father.[8] Moreover, the record shows that Londo still has problems doing chores, shopping, reading, paying bills, and performing activities that require persistent concentration and pace.

On March 19, 2002, Dr. G. D. Sagrera concluded that despite the fact that Londo reported that he was living alone, his mental retardation was disabling.[9] Dr. Sagrera noted that while Londo "answered questions appropriately," his affect was "very flat," and he was unable to read and write in the office. Furthermore, Londo "had difficulty making change for ten dollars."[10]

At the hearing, Londo testified that he lives with his father, does not cook, needs help shopping and paying bills, and has difficulty calculating change when he goes to the store.[11] He has a driver's license, but only drives occasionally.[12] Londo's mother testified that although Londo tried to work, he could not keep a job, and his bosses told her that it was because he "was slow at doing it" and he could not keep up.[13]

---

[7] Tr. 17.

[8] Tr. 378.

[9] Tr. 283.

[10] Tr. 283.

[11] Tr. 378.

[12] Tr. 381.

[13] Tr. 390.

6

The foregoing shows that Londo remains dependent on others for help in routine activities.  There is no substantial evidence supporting the conclusion that Londo has had the required medical improvement in functioning *related to his ability to work.*

It is also clear that the ALJ's unfavorable opinion was fueled in part by a finding that Londo's most recent IQ scores were invalid.  There is no substantial evidence for this finding.

On September 24, 2002, Sandra B. Durdin, Ph.D. administered the WAIS-III test, which showed that Londo's IQ scores were in the mental retardation range – verbal IQ of 70, a performance IQ of 67 and a full scale of 66.[14]  The ALJ found, however, that Dr. Durdin believed the scores to be invalid.  The ALJ wrote, with respect to Dr. Durdin's IQ test:

> * * * Though there was no clear evidence of malingering, Dr. Durdin did note that the claimant did not persist on tasks if he did not have an immediate solution.  For this reason, Dr. Durdin suggested that her score are (sic) 'submitted for consideration with other data concerning his level of functioning.'  In her concluding paragraph, Dr. Durdin specifically stated that the scores 'need comparison with school records, etc. to determine validity.'  *Thus, Dr. Durdin did not find the claimant's IQ score to be valid.*

(Tr. 16)(emphasis supplied).

The ALJ's interpretation of Dr. Durdin's findings is wholly unsupported by the record. Dr. Durdin noted during her examination that although Durdin's speech was intelligible, he was personable, and his effort was good, Durdin "gives the impression of significantly subaverage intelligence on interview and mental status exam."[15]  Although Londo stated he had been living alone for the past seven months, Dr. Durdin noted that he arrived at the exam with a female friend who assists him on a regular basis with reading his mail and paying his bills.  Londo

---

[14] Tr. 299-300.

[15] Tr. 299.

reported that he spent most of his time watching TV, and "he gave the impression that his mother or this young woman do almost everything else for him."[16] She noted his IQ scores were in the "mild mentally deficient range" and that "he has an attention span commensurate with these scores." Dr. Durdin concluded:

> Mr. Londo appears to be very passive and he did not persist on tasks if he did not have an immediate solution. I saw no clear evidence of malingering. Therefore, the [scores] are submitted for consideration with other data concerning his level of functioning... These scores need comparison with school records, etc. to further determine validity."[17]

Dr. Durdin's report in no way supports the ALJ's conclusion that his IQ scores were invalid.[18] To the contrary, Dr. Durdin's report supports the conclusion that Londo continues to meet the first prong of §12.05D, "[a] valid verbal, performance, or full scale IQ of 60 through 70." Moreover, Londo's recent IQ scores are consistent with his 1997 scores, which ranged between 63 and 66.

Londo also meets the remaining requirement of §12.05D – at least two areas of marked restriction or difficulty in daily living, social function, concentration/persistence, or repeated episodes of decompensation. As discussed above, even when Londo lived alone, he had daily assistance with activities of daily living, such as an shopping alone, reading mail, cooking, or paying bills. Likewise, he has difficulty in maintaining concentration and pace, which was noted

---

[16] Tr. 300.

[17] Id.

[18] Dr. Durdin's mild caution – as reflected in her diagnosis of "Mild Mental Deficiency - provisional" – clearly relates to the fact that she had never seen Londo before and had been given no school or medical records to review (Tr. 301).

8

by Dr. Durdin, and is consistent with the statement of a previous employer that Londo "is very forgetful when he is told to do work" and "was very slow to catch on to the work."[19]

The record shows no medical improvement in Londo's condition as it existed in 1998 compared to 2002.  During these time periods, Londo had virtually the same IQ scores, he had difficulty reading, performing chores, and managing funds.  Although Londo lived by himself for a period of time, he had daily assistance.  Furthermore, any medical improvement which may have occurred in his functional ability relates incrementally to his ability to care for himself.  Certainly, it is an insufficient basis upon which to conclude Londo has experienced medical improvement related to the ability to work.  It is clear that Londo cannot hold a job in any realistic work setting.

For the foregoing reasons, I find that Londo has not medically improved since the 1998 decision, and he remains disabled under § 12.05D.

Accordingly, the undersigned concludes that the ALJ's decision that Londo was no longer entitled to benefits is not supported by the record.

### *Conclusion*

Considering the foregoing, **IT IS RECOMMENDED** that the ALJ's decision be **REVERSED**.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and Fed.R.Civ.P. 72(b), the parties have ten (10) days from receipt of this Report and Recommendation to file specific, written objections with the Clerk of Court.  Counsel are directed to furnish a courtesy copy of any objections or responses to the district judge at the time of filing.

---

[19] Tr. 300, 194.

9

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10) days following the date of receipt, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.  See <u>Douglass v. United Services Automobile Association</u>, 79 F.3d 1415 (5th Cir.  1996).**

Signed at Lafayette, Louisiana, on February 27, 2008.

*[signature]*

Mildred E. Methvin
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)